[Doc. No. 22]

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
## CAMDEN VICINAGE

| | |
|---|---|
| **PRECISION FUNDING GROUP, LLC,**<br><br>**Plaintiff,**<br><br>v.<br><br>**NATIONAL FIDELITY MORTGAGE,**<br><br>**Defendant.** | **Civ. No. 12-5054 (RMB/JS)** |

### OPINION

Plaintiff and defendant are competing mortgage brokerage firms. After two of plaintiff's employees left to work for defendant, plaintiff sued. Plaintiff also filed arbitration complaints against its former employees. Defendant is seeking to compel plaintiff to arbitrate its dispute based on the terms of the arbitration clauses in the employees' employment agreements ("agreements"). The issue before the Court involves whether and under what circumstances a non-party to an arbitration agreement, in this case defendant, may compel a party to the agreement, in this case plaintiff, to arbitrate. For the reasons to be discussed defendant's motion seeking to compel arbitration is GRANTED.

## BACKGROUND[1]

As noted, PFG and NFM are competing mortgage brokerage firms. PFG filed suit against NFM after at least two of its employees resigned and began working for NFM. During their employment at PFG the two employees were required to sign employment agreements

---

[1] The parties have not argued, and the Court has not found, disputed issues of material fact relevant to this decision. Since defendant relies upon materials outside of the complaint in support of its motion, the Court will apply a summary judgment standard. Guidotti v. Legal Helpers Debt Resolution, L.L.C., ---

("agreements").   The agreements contained a non-compete clause, which prohibited the

employees from working for a competitor for two years after they left PFG.  The agreements also

contained a non-solicit clause, which prohibited the employees from soliciting PFG's customers

for two years, and from soliciting PFG's employees for one year.  In addition, the agreements

contained a clause providing that "all leads and loans remain property of Company [PFG] at all

times, even after Employee is no longer employed by Company."  Complaint ¶ 10 [Doc. No. 1].

At issue here are the arbitration clauses in the employees' agreements which provided:

> Any controversy, dispute, or claim of whatever nature arising out of, in connection with, or in relation to the interpretation, performance, or breach of this agreement, including any claim based on contract, tort, or statute, shall be settled, at the request of any party by the final and binding arbitration conducted at a location determined by the arbitrator in Cherry Hill, New Jersey, administered by and in accordance with the then existing rules of practice and procedure of the National Arbitration Forum, and judgment upon any award rendered by the arbitrator(s) may be entered by any state or federal court having jurisdiction.

Matthew Prizzi Employment Agreement ¶ 16, Complaint, Ex. A [Doc. No. 1-1]; John Itri

Employment Agreement ¶ 16, Motion to Compel Arbitration, Ex. J [Doc. No. 22-3].  After filing

suit against NFM, PFG filed separate arbitration complaints against its two former employees,

John Itri ("Itri") and Matthew Prizzi ("Prizzi"), alleging they breached their employment

agreements when they left PFG to work for NFM.  Itri and Prizzi are currently employed by

NFM.

When Itri left PFG he was a loan officer at the corporate office.  PFG alleges Itri solicited

its employees to resign and work for NFM.  PFG also alleges Itri knew PFG's employees signed

employment agreements similar to his when he solicited them for employment at NFM.  Itri

Complaint ¶¶ 11-25, 50; Motion to Compel Arbitration, Ex. J [Doc. No. 22-3].[2]  Itri's complaint

---

F.3d ---, 2013 WL 2302324, at *8 (3d Cir. May 28, 2013).
[2] When the Court refers herein to the Itri and Prizzi complaints it is referring to the arbitration complaints PFG filed.  All references to just the "complaint" refer to the complaint in this action filed against NFM.

pleads two breach of contract claims alleging Itri breached the non-compete and anti-solicitation clauses in his agreement.   The complaint also contains claims for defamation, commercial disparagement, and intentional interference with a contractual relationship.  See generally id.

Prizzi was a branch manager while employed by PFG.  PFG alleges the Prizzi Branch collectively resigned and began working for NFM.   Prizzi Complaint ¶¶ 4-5, 8; Motion to Compel Arbitration, Ex. A [Doc. No. 22-3].  PFG also alleges Prizzi re-directed a phone number on a PFG marketing flyer so customers attempting to call PFG actually called NFM.   PFG alleges Prizzi told one such caller PFG was no longer in business.  Id. ¶¶ 25-27.  Further, PFG alleges Prizzi took clients from PFG to NFM.  Id. ¶¶ 88-92.   Due to Prizzi's alleged false comment that PFG was no longer in business, Prizzi's complaint pleads defamation and commercial disparagement claims.   PFG also brought claims for conversion and intentional interference with prospective contractual relationships against Prizzi because of the alleged re-directing of the marketing flyer phone number.   PFG also asserts breach of contract claims against Prizzi due to the non-compete, anti-solicitation, and leads clauses in his agreement.  See generally id.

PFG's complaint against NFM contains six counts.   Count one is a defamation claim. PFG alleges Prizzi made false statements "regarding the viability and status" of its business to at least one customer.  Complaint ¶¶ 56-61.  Count two is a commercial disparagement claim.  PFG alleges Prizzi/NFM's false statements caused it to lose clients and damaged its business reputation.  Id. ¶¶ 62-66.  Count three is a conversion claim.  PFG alleges that when the Prizzi branch left PFG it re-directed a phone number on a PFG marketing flyer to NFM's office.  Id. ¶¶ 67-77.   Count four is an unfair competition claim.  PFG alleges NFM was aware the phone number from PFG's marketing flyer was diverted to NFM and knew potential customers thought

3

they were contacting PFG rather than NFM.  Id. ¶¶ 78-86.  Count five is an intentional interference with prospective contractual relationship claim.  PFG alleges that because of the redirected phone number borrowers entered into contracts with NFM instead of PFG.  Id. ¶¶ 87-96.  Count six is an intentional interference with a contractual relationship claim.  PFG alleges NFM was made aware that its employees who formerly worked for PFG were soliciting current PFG employees to work for NFM, and that this violated PFG's employment agreements.  Further, PFG alleges NFM paid Itri and Prizzi additional compensation when they successfully solicited former PFG employees.  Id. ¶¶ 97-109.

As is evident from the foregoing discussion, the vast majority of PFG's complaint focuses on the actions of Itri and Prizzi, especially their alleged solicitation of PFG's employees and customers.  In fact, the factual averments in PFG's three complaints are almost identical. The facts relating to "Borrower One" and "Borrower Two" in the Prizzi and NFM complaints are identical and address Prizzi's conduct.  Compare Complaint ¶¶ 33-55, with Prizzi Complaint ¶¶ 23-45.   Also, the statements in the complaint addressing Itri, Prizzi and other PFG employees who are now employed by NFM are the same as those in the Itri and Prizzi complaints, and were combined in the NFM complaint under the headings "Background," "Matthew Prizzi and John Itri," and "Other Employees Leave PFG to Join NFM."  Compare Complaint ¶¶ 6-32, with Itri Complaint ¶¶ 4-25, and Prizzi Complaint ¶¶ 4-22.

In addition to the fact similarity in PFG's complaints, the legal claims PFG asserts against NFM are almost identical to the claims asserted against Itri and/or Prizzi.  Counts one and two sound in defamation and commercial disparagement and address Prizzi's statement to a customer that PFG was no longer in business.  These counts are virtually identical to the defamation and commercial disparagement claims in the Prizzi complaint.  Compare Complaint

4

¶¶ 56-66, with Prizzi Complaint ¶¶ 46-58.   Counts three and five sound in conversion and intentional interference with a prospective contractual relationship, and are substantially similar to the conversion and intentional interference counts in the Prizzi complaint.   These counts address the alleged consequences of Prizzi re-directing the phone number to NFM.   Compare Complaint ¶¶ 67-77; 87-96, with Prizzi Complaint ¶¶ 59-79.   Counts four and six sound in unfair competition and intentional interference with a contractual relationship, and are the only counts not contained in the Itri and Prizzi complaints.   Nevertheless, these counts directly involve Itri and Prizzi and address underlying facts that are central to the arbitration claims pending against them.   In count four, PFG alleges that NFM was made aware of the re-directed phone number but did nothing to remedy the problem.   Complaint ¶¶ 78-86.   In count six, PFG alleges NFM paid additional compensation to employees who solicited PFG employees for employment at NFM even after NFM became aware of its employees' employment agreements with their former employer, PFG.   Complaint ¶¶ 97-109.   Count six, however, is similar to the intentional interference with a contractual relationship claim in the Itri complaint.   Compare id., with Itri Complaint ¶¶ 48-59.

Although NFM is not a signatory to the Itri or Prizzi employment agreements, it is seeking to compel PFG to arbitrate the claims against it based on the arbitration clauses in the Itri and Prizzi agreements.   NFM argues the Court should compel arbitration because the conduct alleged by PFG in this case arises from the employment agreements, and the claims in this case and the claims in the arbitration matters are "inextricably intertwined."   Memorandum in Support of Defendant NFM's Motion to Compel Arbitration, or in the Alternative, to Stay Pending Arbitration ("NFM's Memo") at 10 [Doc. No. 22-1].   PFG argues in response that although there is an overlap between its claims against Itri, Prizzi and NFM, there is an insufficient nexus to

warrant the Court to Order PFG to arbitrate.  <u>See</u> Brief in Opposition to Defendant's Motion to Compel Arbitration, or for Stay ("PFG's Opposition") at 4 [Doc. No. 24].  PFG also argues the claims at issue are not within the scope of the arbitration clause in the agreements.  <u>Id.</u> at 10-11.  In the alternative, NFM argues the Court should stay this matter pending resolution of the arbitration proceedings between Itri, Prizzi, and PFG because the claims asserted against it significantly overlap with the claims asserted against Itri and Prizzi.  <u>See</u> NFM's Memo at 18.  PFG opposes staying the case, arguing that NFM would not face a clear case of hardship or inequity if the case were to proceed while the employee arbitrations continue.  <u>See</u> PFG's Opposition at 4.

**DISCUSSION**

      1.    <u>Black Letter Law</u>

      The black letter law regarding contractual arbitration provisions is relatively well-settled and was recently summarized by this Court in <u>Haskins v. First Am. Title Ins.</u>, 866 F. Supp. 2d 343, 347-48 (D.N.J. 2012).  "[A]rbitration is . . . a matter of contract between the parties; it is a way to resolve those disputes-but only those disputes-that the parties have agreed to submit to arbitration."  <u>First Options of Chi., Inc. v. Kaplan</u>, 514 U.S. 938, 943 (1995).  In the absence of "clea[r] and unmistakabl[e]" evidence "it is 'the court's duty to interpret the [arbitration] agreement and to determine whether the parties intended to arbitrate grievances concerning' a particular matter."  <u>Granite Rock Co. v. Int'l Broth. of Teamsters</u>, 130 S.Ct. 2847, 2858 (2010) (quotation and citation omitted).  Courts apply a two-step test to determine whether a cause of action is supplanted by an existing arbitration agreement.  <u>Trippe Mfg. Co. v. Niles Audio Corp.</u>, 401 F.3d 529, 532 (3d Cir. 2005).  Courts first determine whether a valid agreement to arbitrate exists.  If a valid agreement exists a court should then determine whether the agreement

encompasses the dispute at issue.  Id.  "When determining both the existence and the scope of an arbitration agreement, there is a presumption in favor of arbitrability."  Id.  This presumption is not absolute, however, and should be applied "only where a validly formed and enforceable arbitration agreement is ambiguous about whether it covers the dispute at hand; and . . . where the presumption is not rebutted."  Granite Rock Co., 130 S.Ct. at 2858-59.  If an agreement to arbitrate exists and the dispute is encompassed by the agreement, courts must enforce the agreement according to its terms.  CompuCredit Corp. v. Greenwood, 132 S. Ct. 665, 669 (2012).  In this case it is plain that PFG is not contractually bound to arbitrate its claims against NFM because there is no arbitration agreement between the parties.  Nevertheless, PFG may still be required to arbitrate its claims against NFM pursuant to an equitable estoppel theory.

      2.     Equitable Estoppel

The Third Circuit recognizes two lines of cases where a court may compel arbitration under a theory of equitable estoppel.  The first line of cases applies where a signatory to an arbitration agreement seeks to compel a non-signatory to arbitrate.  "[C]ourts have held non-signatories to an arbitration clause when the non-signatory knowingly exploits the agreement containing the arbitration clause despite having never signed the agreement."  E.I. DuPont de Nemours & Co. v. Rhone Poulenc Fiber & Resin Intermediaries, S.A.S. ("DuPont"), 269 F.3d 187, 199 (3d Cir. 2001) (finding that non-signatory DuPont was not required to arbitrate its claims because it did not embrace the agreement containing the arbitration clause or receive a direct benefit from it).  Because there is no evidence that NFM exploited PFG's agreements, this theory is inapplicable.  This theory is also not applicable because here a signatory (PFG) is not seeking to compel a non-signatory (NFM) to arbitrate.  See Hautz Constr. v. H & M Dep't Store, No. 12-3478 (FLW), 2012 WL 5880370, at *14 n. 8 (D.N.J. Nov. 20, 2012) (stating that cases

relying on the "direct benefit" theory of estoppel apply only to non-signatories trying to avoid arbitration).   The second line of Third Circuit equitable estoppel cases applies where a non-signatory (NFM) seeks to compel a signatory (PFG) to arbitrate.   "[C]ourts have bound a signatory to arbitrate with a non-signatory 'at the non-signatory's insistence because of the close relationship between the entities involved, as well as the relationship of the alleged wrongs to the non-signatory's obligations and duties in the contract . . . and [the fact that] the claims were intimately founded in and intertwined with the underlying contract obligations.'"   DuPont, 269 F.3d at 199.  New Jersey recognizes that a non-signatory has standing to compel a signatory to arbitrate under a similar theory of estoppel.  See EPIX Holdings Corp. v. Marsh & McLennan Cos., Inc. ("EPIX"), 410 N.J. Super. 453, 463 (App. Div. 2009); Alfano v. BDO Seidman, LLP, 393 N.J. Super. 560, 569 (App. Div. 2007).

Pursuant to an equitable estoppel theory, a court may require a signatory to arbitrate its claims against a non-signatory in at least two situations.   First, a non-signatory may compel arbitration when the issues to be litigated are "inextricably intertwined" with the arbitration agreement such that the claims asserted against the signatory and the non-signatory are identical. See id. at 463, 465; see also Bruno v. Mark McGrann Assocs., 388 N.J. Super. 539 (App. Div. 2006) (requiring a homeowner to arbitrate claims asserted against a subcontractor because the claims regarding building defects arose directly out of the contract the homeowners entered into with the contractor, which contained an arbitration clause).   A non-signatory may also compel arbitration, where there is a "requisite nexus of the claim to the contract *together with* [an] … integral relationship between the non-signatory and the other contracting party."   EPIX, 410 N.J. Super. at 466.  Whether to compel arbitration pursuant to equitable estoppel is a fact specific inquiry.  Consequently, a court must conduct "an analysis of the connection between the claim,

8

the arbitration agreement and the parties." EPIX, 410 N.J. Super. at 463.

NFM argues PFG's claims against it, Itri and Prizzi are so intertwined that PFG should be compelled to arbitrate.  NFM argues that five of the six claims PFG asserts against it are also asserted in the Itri and/or Prizzi arbitration complaints.  As a result, NFM argues its claims and the parties are inextricably intertwined, such that the Court should compel arbitration.  NFM's Memo at 14-15.  NFM also argues the Court should compel arbitration because the asserted claims expressly reference PFG's employment agreements containing arbitration provisions.  Id. at 15.  In addition, NFM argues it has an integral relationship with PFG's former employees because they currently work for NFM and PFG filed complaints against all three parties.  Id.  In response, PFG argues the Court should not compel arbitration because the claims asserted against NFM are not identical to the claims asserted against Itri and Prizzi.  PFG also argues some of its claims against NFM are independent of Itri and Prizzi's actions.  See PFG's Opposition at 8-9.  In addition, PFG argues there is no integral relationship between NFM, Itri, and Prizzi.  Id. at 9.

As will be discussed, the most analogous reported decisions favor NFM.  An instructive case where the Court addressed whether a non-signatory could compel a signatory to arbitrate is EPIX, supra.  In EPIX, EPIX hired Marsh & McLennan ("Marsh") to secure workers' compensation coverage for its customers.  To obtain coverage Marsh negotiated with AIG.  After an AIG subsidiary (AIG Risk Management, Inc.) issued a Binder Letter to Marsh, EPIX started making payments on the policy.  EPIX then executed a more detailed payment agreement with a different AIG subsidiary, National Union.  The payment agreement with National Union contained an arbitration clause.  Id. at 460.  EPIX filed suit against AIG, National Union, Marsh, and others alleging, inter alia, that they conspired to manipulate and rig prices in violation of

antitrust law.  In the lower court, AIG moved to compel EPIX to arbitration based on the contract clause in the payment agreement EPIX signed with National Union.  The lower court denied AIG's request but this decision was reversed on appeal.  The Appellate Division held that "all the factors favoring estoppel are present."  Id. at  467.  The Court first noted that AIG, the non-signatory, was closely aligned with the signatory to the agreement, National Union.  The Court also noted that plaintiff's complaint referred to the parties interchangeably and collectively and did not allege either party acted independently.  In addition, the Court noted that EPIX's claims were "inextricably intertwined" with the National Union agreement such that EPIX would have no cause of action but for the agreement.  Id. at 468.   Based on these factors the Appellate Division held that AIG had standing to compel arbitration.  The Court concluded that, "the combination of the requisite nexus of the claim to the contract together with the integral relationship between the non-signatory and the other contracting party was … a sufficient basis to invoke estoppel."  EPIX, 410 N.J. Super. at 465-66.

Another instructive case is Hirsch v. Amper Fin. Servs., LLC, No. L-5732-10, 2012 WL 1379976 (N.J. App. Div. Apr. 23, 2012).  In Hirsch, the court compelled signatories to arbitrate their dispute with non-signatories pursuant to an agreement containing an arbitration clause because the claims and the parties were integrally related to an ongoing, arbitrable dispute.  The plaintiffs in Hirsch filed suit against their accounting firm, EisnerAmper, and AFS, a financial planning firm, after purchasing securities that defaulted.   Defendants filed a third-party complaint against SAI, the brokerage firm for the securities purchased, and Marc Scudillo, the SAI broker.  Id. at *1-2.  Scudillo was also an investment advisor for AFS.  Further, AFS and EisnerAmper considered themselves "a team to advise clients . . . on a host of financial matters." Id. at *5.  Although the plaintiff had no arbitration agreement with the defendants it sued, SAI's

10

account agreements with the plaintiff contained arbitration clauses.[3]   SAI filed a motion to compel arbitration seeking to consolidate the matter with an on-going arbitration regarding the defaulted securities.   Affirming the lower court's decision granting SAI's motion to compel arbitration, the court reasoned that because the arbitration and legal action arose from the same transactions, the legal and factual issues were "intertwined" and would benefit from resolution in one proceeding.   Id.[4]   The court also noted that plaintiff's complaint against the defendants named Scudillo numerous times, and AFS and EisnerAmper were part of a "team."   Id. Consequently, the court found the "complex and intertwined relationship between and among plaintiffs, Scudillo, EisnerAmper and AFS is an 'integral' one which provides 'sufficient basis to invoke estoppel.'"   Id. at *5 (citing EPIX, 410 N.J. Super. at 466).   The Court noted that the plaintiffs' claims against the defendants "arise directly" from the events that were subject to arbitration.   Id. at *5.   Here, as in Hirsch, PFG's claims against NFM "arise directly" from the actions of Itri and Prizzi that are subject to arbitration.

Still another instructive case is Guidotti v. Legal Helpers Debt Resolution, L.L.C., No. 11-1219 (JBS/KMW), 2012 WL 3262435, at *8 (D.N.J. Aug. 7, 2012).[5]   In this decision the court also found that a non-signatory defendant had standing to compel plaintiff, a signatory to an arbitration agreement, to arbitrate her claims.   In Guidotti, plaintiff contacted defendants J.G.

---

[3] The arbitration clause provided: "All controversies that may arise between us (including but not limited to, controversies concerning any account, order, or transaction, or the continuation, performance, interpretation, or breach of this or any other agreement between you and us, whether entered into or arising before, on or after the date this account is opened) shall be determined by arbitration . . . ." Hirsch, 2012 WL 1379976, at *1.

[4] Although the motion to compel in Hirsch was brought by a signatory, the court applied the same theory of equitable estoppel that applies if a non-signatory seeks to compel a signatory to arbitrate.   See Hirsch, 2012 WL 1379976, at *5 (quoting "inextricable connectivity" language from EPIX, 410 N.J. Super. at 465-66).

[5] The Guidotti decision recently decided by the Third Circuit (Guidotti v. Legal Helpers Debt Resolution, L.L.C., --- F.3d ---, 2013 WL 2302324 (3d Cir. May 28, 2013), does not apply here.   That decision addressed the standard of review to apply where there was a factual dispute whether the plaintiff signed

Debt Solutions and Joel Gavalas ("J.G./Gavalas") seeking debt reduction services.  After giving

plaintiff an overview of a debt reduction plan, J.G./Gavalas referred her to Eclipse and Legal

Helpers Debt Resolution ("LHDR").  Eclipse provided plaintiff with detailed information about

her debt reduction plan, and an Attorney Retainer Agreement, which contained an arbitration

clause.[6]  Plaintiff signed the retainer agreement and returned it to Eclipse.  Id. at *2.  Plaintiff

made payments to LHDR and Eclipse according to the debt reduction plan but at least three

creditors sued her seeking to recover debts.  Id. at *3.  Plaintiff filed suit against LHDR,

J.G./Gavalas, Eclipse and other parties because they failed to negotiate with her creditors as she

was allegedly led to believe.  Plaintiff also alleged that Eclipse hired J.G./Gavalas to provide

customer leads and was paid a commission based on the amount of debt and fees channeled to

Eclipse.  Id.  J.G./Gavalas filed a motion to compel arbitration.  In granting the motion the court

determined that "plaintiff seeks relief from J.G. and Gavalas under exactly the same counts as

against the Law Firm Defendants [Eclipse and LHDR]."  Id. at *7.  Further, plaintiff sought to

recover from J.G./Gavalas, in part, due to Eclipse and LHDR's conduct.  As a result, the court

determined the claims were sufficiently intertwined to compel arbitration pursuant to equitable

estoppel.  Id.  The Court reasoned that the plaintiff could not assert a claim against the non-

signatories that did not arise out of the agreement containing the arbitration clause.  Id. at *7.

The Court held, like here, that the claims against the non-signatories were based on the actions of

---

an arbitration agreement.  Here there is no dispute that the agreements Itri and Prizzi signed with PFG
contained arbitration clauses.

[6] The arbitration clause stated: "In the event of any claim or dispute between Client and LHDR related to
the Agreement or related to any performance of any services related to this Agreement, such claim or
dispute shall be submitted to binding arbitration upon the request of either party upon the service of that
request."  The court previously determined Eclipse was an agent or independent contractor of LHDR.
Guidotti v. Legal Helpers Debt Resolution, L.L.C., 866 F. Supp. 2d 315, 332 (D.N.J. 2011).

persons/parties that had arbitration agreements with the plaintiff.  Id.

Here, the Court finds there is a sufficient basis to invoke equitable estoppel and compel PFG to arbitrate its claims against NFM.  The inextricable connection between the claims in this case and PFG's arbitration claims against Itri and Prizzi, and the inextricable connection between NFM, Itri and Prizzi, is demonstrated by the following summary:  (1) the essence of the claims PFG asserts against Itri, Prizzi and NFM are the same; (2) PFG's claims against NFM rise or fall based solely on the actions of Itri and Prizzi; (3) PFG's legal causes of action against Itri, Prizzi and NFM are essentially identical; (4) the viability of PFG's claims against NFM are exclusively based on the actions of Itri and Prizzi; and (5) all material issues in the case are bound up with and arise out of PFG's employment agreements which contain the arbitration clauses at issue. Indeed, it is difficult to conceive of an employment case where the claims subject to a pending arbitration and the claims at issue in a pending federal lawsuit are more closely aligned than they are in this case.  In EPIX, the Court wrote that, "the principle of equitable estoppel has been invoked, under appropriate circumstances, to force an objecting signatory to arbitrate the same claims against a non-signatory as alleged against [another] party."  410 N.J. Super. at 465.  This is the situation that exists here.  NFM is seeking to compel PFG to arbitrate essentially the same claims PFG is arbitrating with Itri and Prizzi.  Of particular significance to the Court in EPIX was the fact that EPIX's claims were "bound up" with the contract containing the arbitration clause.  Id. at 468.  The EPIX decision also noted that if EPIX had not contracted with National Union, EPIX would not have a cause of action against AIG.  Id.  Similarly, PFG's claims against NFM are inextricably "bound" up with PFG's employment agreements with Itri and Prizzi. Without those agreements, like in EPIX, PFG would have no claim against NFM.  Albeit, the

Court recognizes that a tiny part of PFG's claims arguably stands outside the four corners of the agreements.

Although it is true, as PFG argues, that it is asserting an isolated independent wrongdoing as to NFM, the argument is misleading.  PFG argues that it put NFM on notice of its contractual rights and NFM's tortious acts continued.  However, the fact of the matter is that all of NFM's alleged tortious conduct derives from the actions of Itri and Prizzi, and the alleged breach of their employment agreements.  Further, although PFG seeks damages because of the actions of other (unidentified) ex-employees, PFG admits those persons came to NFM because of Itri and Prizzi.  Besides, this claim is a very small part of PFG's overall claim.  Moreover, it does not go unnoticed that PFG did not identify these individuals or name them in this lawsuit.

PFG argues that for a court to compel arbitration under an estoppel theory the claims asserted against the non-signatory must be identical to the claims asserted against a signatory.  PFG's Opposition at 8-9.  PFG argues this distinguishes this case from the cited cases herein.  PFG also argues it is seeking to recover damages due to NFM's independent tortious conduct.[7] Id. at 9.  For these reasons, PFG argues, the Court should not compel arbitration.  The Court disagrees with PFG.  The Court finds that the claims asserted against a signatory and non-signatory need not be identical in all respects in order to compel arbitration.  See Hirsch, WL 1379976, at *5 (granting motion to compel arbitration brought by third-party defendant). For example, in Guidotti the court concluded plaintiff was damaged by the "collective scheme" of

---

[7] There are two acts of alleged independent conduct.  First, PFG alleges NFM pays Itri and Prizzi additional compensation because they recruited its employees to work for NFM even after learning about the anti-solicitation clause in the PFG employment agreements.  Second, PFG alleges NFM did nothing after it found out that Prizzi re-directed its marketing flyer phone number.  Complaint ¶¶ 87-96; 103-109.

the defendants and her injuries stemmed from the conduct of J.G./Gavalas.  In other words, the court looked at the underlying facts and claims and not the precise legal theory that was pursued. Id.  Here, despite PFG's arguments, the alleged independent conduct of NFM is not truly independent.  Rather, it is akin to the "collective scheme" of the Guidotti defendants because PFG seeks to recover from NFM for injuries collectively caused by Itri, Prizzi and NFM.

The only case PFG cites that denied a non-signatory's request that a signatory arbitrate is EV3 Inc. v. Collins, Nos. A08-1816, A08-1901, 2009 WL 2432348 (Minn. Ct. App. Oct. 20, 2009).  However, this case is not persuasive authority.  First, the court wrote that "many of the claims" raised by the signatory, "have nothing to do with" the contracts containing the arbitration clauses."  Id. at *7.  As discussed, this is not the situation here.  The Court also added the signatory's claims "[did] not implicate the contracts of the individual defendants that contain the mandatory arbitration provisions" and "[did] not relate to the contracts of the individual defendants."  Id. at *4.  Again, this is not true here.  Also, unlike here, many of the signatories' claims arose from statutory and common law duties rather than the contracts containing arbitration clauses.  Id. at *4-5.  Perhaps most importantly, the EV3 Inc. decision denied the motion to compel arbitration because the signatory's claims "did not arise out of and relate directly to the individual defendants' employment contracts because most of the claims asserted by respondents do not refer to or presume the existence of the individual defendants' employment contracts."  Id. at 5.  Again, this situation does not exist here.

PFG argues there is no "integral relationship" between NFM and its employees sufficient to compel arbitration.  PFG argues a sufficient relationship on which to compel arbitration only includes (1) a parent/subsidiary; (2) a successor corporation; or (3) when a signatory acts as an

agent for a non-signatory.  PFG's Opposition at 9.  The Court disagrees.  A non-signatory's motion to compel arbitration may be granted if the non-signatory is "closely aligned" to a contracting party.  EPIX, 410 N.J. Super. at 466.  The parties are closely aligned here because NFM currently employs Itri and Prizzi.  Id.; see also GATX Mgmt. Servs., LLC v. Weakland, 171 F. Supp. 2d 1159 (D. Colo. 2001) (compelling arbitration due to the substantial interdependence and concerted misconduct between former employee signatory and his new employer).  Another reason the Court concludes that Itri, Prizzi and NFM are closely aligned is because the current dispute arises directly from Itri and Prizzi's employment with NFM.  Moreover, in EPIX the court determined the parties were closely aligned in part because the complaint referred to the signatories and non-signatories collectively.  EPIX, 410 N.J. Super at 467; see also Hirsch, 2012 WL 1379976, at *5 (finding non-signatories and signatories were closely aligned, in part, because the complaint mentions both parties numerous times).  PFG names Itri, Prizzi and NFM collectively throughout the complaint.  The Court finds, therefore, that NFM has standing to compel PFG to arbitrate its claims.[8]

       3.      Scope of the Arbitration Agreement

After a court determines a non-signatory has standing to bring a motion to compel arbitration it must determine whether the claims fall within the scope of the applicable arbitration agreement.  See EPIX, 410 N.J. Super. at 468.  In determining the scope of an arbitration

---

[8] At oral argument PFG argued that PFG's "subjective contemplation" when it executed its employment agreements is controlling as to defendant's motion.  Transcript of Oral Argument  ("Tr.") 23:24-24:3. [Doc. No. 41].  Counsel explained that arbitration is mandated where the non-signatory is "bound up" with the contract containing the arbitration agreement.  Id. 24:11-25:25.  PFG essentially argues arbitration is not mandated because when the Itri and Prizzi agreements were signed NFM was "not in the picture."  The Court finds no support in the case law for this argument.  The relevant cases focus on the totality of the circumstances regarding the relevant parties and claims, not just whether the signatory

agreement, "if the factual allegations [in the complaint] touch matters covered by the parties' contract, then those claims must be arbitrated." Id. at 473.  Further, "when determining . . . the scope of an arbitration agreement, there is a presumption in favor of arbitrability." Trippe Mfg. Co., 401 F.3d at 532.  If a valid and enforceable arbitration agreement is broad in its scope, "[a]n order to arbitrate . . . should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." Century Indem. Co. v. Certain Underwriters at Lloyd's, London, 584 F.3d 513, 556 (3d Cir. 2009) (quotation and citation omitted).

NFM argues the claims asserted against it fall within the scope of the arbitration clauses because both contain broad "arising out of" language.  NFM's Memo at 17.  If "arising out of" is part of an arbitration agreement courts generally consider this language to indicate "an 'extremely broad' agreement to arbitrate any dispute relating in any way to the contract." Griffen v. Burlington Volkswagen, Inc., 411 N.J. Super. 515, 518 (App. Div. 2010) (internal citations omitted).  The court in Griffen concluded plaintiff's civil claims regarding an alleged false arrest arose out of a broad arbitration clause in the retail order form plaintiff signed when he purchased a car.[9]  After failing to repossess Griffen's car when financing fell through, Volkswagen reported the car to the police as stolen.  Griffen was arrested and then filed suit against Volkswagen.  Id. at 517.  The court concluded Griffen's claims were partially dependent on a determination of the parties' interests in the car pursuant to the retail order form.  Id. at 519-

---

(PFG) had a nexus with the non-signatory (NFM) when the arbitration agreement was executed.
[9] The arbitration clause provided in part: "The parties to this agreement agree to arbitrate any claim, dispute, or controversy, including all statutory claims and any state or federal claims, that may arise out of or relating to the purchase or lease identified in this Motor Vehicle Retail Order . . ." Griffen, 411 N.J.

20.  Similarly, the arbitration clause in <u>EPIX</u> contained broad arising out of language.[10]  The court in <u>EPIX</u> concluded that plaintiff's statutory and common law claims regarding an alleged conspiracy regarding workers' compensation insurance coverage arose out of and were intertwined with the insurance contract because execution of the contract "[gave] rise to the claimed injury."  <u>EPIX</u>, 410 N.J. Super. at 474.  Here, the Court concludes that PFG's claims fall within the scope of the arbitration clauses.  The arbitration clauses in Itri and Prizzi's agreements contain similar broad "arising out of" language.  Further, as in <u>Griffen</u> and <u>EPIX</u>, whether NFM is liable depends on whether Itri and Prizzi are liable and breached their agreements.  As a result, the claims asserted against NFM relate to the agreements.  Therefore, the claims arise out of matters covered by the agreements.

PFG argues the agreements were only meant to govern the terms of Itri and Prizzi's employment with PFG, before either employee established a relationship with NFM.  PFG's Opposition at 10.  Further, PFG argues the claims it brought against NFM could be asserted even in the absence of the agreements.  As a result, PFG argues its claims do not arise out of the employment agreements.  <u>Id.</u> at 11.  The Court, however, concludes PFG intended the employment agreements to cover acts occurring after its employees' employment with PFG ended.  This is evidenced by the fact that the employment agreements expressly prohibit specific conduct by a signatory employee for two years after employment with PFG ends.  <u>See</u> Complaint ¶ 10.  In addition, for the reasons already discussed, the Court disagrees with PFG that its claims could be asserted in the absence of the agreements.

Super. at 518.
[10] The clause provided: "Any other unresolved dispute arising out of this Agreement must be submitted to

**CONCLUSION**

Because NFM has standing to compel PFG to arbitrate its claims and the claims are within the scope of PFG's arbitration clauses, the Court will grant NFM's motion to compel arbitration. As a result, the Court will not address NFM's alternate argument that this matter should be stayed pending resolution of the Itri and Prizzi arbitrations. That argument is moot. Accordingly, and for all the foregoing reasons, defendant's motion to compel arbitration is GRANTED. An appropriate form of Order will be entered.[11]

s/ Joel Schneider
JOEL SCHNEIDER
United States Magistrate Judge

DATED:  May 31, 2013

---

arbitration." EPIX, 410 N.J. Super. at 461.

[11] The Court recently learned that PFG filed for Chapter 11 reorganization [Doc. No. 44]. As a result, the Itri and Prizzi arbitrations have been stayed because they asserted counterclaims against PFG. After receiving the parties' supplemental briefs, NFM now concedes this case is not subject to an automatic stay. (Albeit, NFM argues the Court should exercise its discretion to stay the case.) This decision does not address whether the appointed arbitrator should or should not stay the arbitration or consolidate the matter with the Itri and Prizzi arbitration cases. That decision will be made by the assigned arbitrator(s).